Hon. THOMAS W. BARTLEY,     Hon. JACOB BRINKERHOFF,
Hon. JOSEPH R. SWAN,     Hon. CHARLES C. CONVERS.*

---

THE STATE OF OHIO, EX REL. THE ATTORNEY GENERAL, *v.* THE SENECA COUNTY BANK.

Where an independent banking company, organized under the act of February 26th, 1845, refuses to make and transmit to the Auditor of State, a statement of its condition, as required by the fifty-ninth section of said act, it thereby incurs the penalty of forfeiture of corporate franchises.

So, where it transfers its assets for the purpose of liquidation, *abandons* its corporate franchises, and wholly ceases to do business as a bank.

So, likewise, when it permits its directors to become largely liable to it as principals and sureties, without the stockholders having first adopted by-laws limiting and regulating such liabilities, according to the provisions of the forty-fourth section of said act.

---

* Hon. Charles C. Convers was commissioned a Judge of the Supreme Court on the 9th day of February, 1856; but on the 15th day of May, 1856, he resigned, on account of ill health, without having taken his seat upon the Bench.

INFORMATION in the nature of a *quo warranto*.

The case is stated in the opinion of the Court.

The *Attorney General*, for the State.

*William H. Gibson* and *John W. Andrews*, for the defendant.

BRINKERHOFF, J., delivered the opinion of the court.

This is an information in the nature of a *quo warranto*, filed by the Attorney General in the name of the State, against the Seneca County Bank, requiring the bank to show by what authority it exercises certain corporate powers and privileges in the information specified.

The bank pleads to the information, setting forth that it is an independent banking company, duly organized, and doing business at Tiffin, in this State, under the act entitled " an act to incorporate the State Bank of Ohio and other banking companies," passed February 26, 1845.

The first clause of the sixty-sixth section of this act is as follows : " If the directors of any banking company which shall have availed itself of any of the privileges granted by this act, shall *knowingly violate, or knowingly permit any of the officers, agents, or servants of such company, to violate* any of the provisions of this act, all the rights, privileges, or franchises of said company, derived from this act, shall thereby be forfeited."

To this plea the Attorney General files five replications, each of which specifies what he claims to be violations of the provisions of the said act, whereby the corporate franchises of the bank became and were forfeited.   To these replications the bank demurs generally ; and the effect of the demurrer being to admit, for the time being at least, the truth of the allegations contained in the replications, we are thus called on to determine the substantial sufficiency of the facts alleged in the replications to work a forfeiture of the corporate existence of the bank.

The fifty-ninth section of the act before referred to, provides that " on each dividend day, the cashier shall make and verify by his

oath, a full, clear and accurate statement of the condition of the company, as it shall be on that day, after declaring the dividend; and similar statements shall also be made on the first Monday of February and August in each year;" and, after specifying seventeen different particulars which shall be embraced in the statement, it adds, "which statement shall be forthwith transmitted to the Auditor of State." And the first replication, after reciting the requirements of this section of the statute, avers that "on the first Monday of February, in the year 1853, the said Seneca County Bank wholly neglected and refused to make said statement, or cause the same to be made and transmitted to the Auditor of State, as required by law."

It will be observed that the fifty-ninth section, under which this replication is framed, renders it the duty of the *cashier* of the bank to make, verify, and transmit the statement of its condition; and, on behalf of the defendant, it is strongly urged in argument that a mere neglect of a cashier to make and transmit the required statements on the day prescribed, ought not to be held to incur a penalty or a consequence so serious as a forfeiture of all corporate franchises. In this we fully concur; and we are very far from holding that a mere neglect of the cashier, or of the directors of a bank, from inadvertance, mistake, or oversight, to make or cause to be made, the statement required by law, or that even the express refusal of the cashier so to do, when such refusal was without the knowledge or consent of the directors, ought to or would work the forfeiture here sought to be enforced. Nor have we overlooked the fact that, by the provisions of the sixty-sixth section above quoted, it is the violation of any of the provisions of the act *by the directors*, or their permission of such violation by any of the agents of the company, which works a forfeiture. And although the cashier is the mere agent and creature of the directors—appointed by them and subject to dismissal at their pleasure—yet, if this replication averred no more than a neglect of the bank, or neglect and refusal of its cashier to make and transmit the required statement, we should, doubtless, hold the demurrer to be well taken. But the allegations of this replication are broader and more extensive than this. "The Seneca

County Bank " is the responsible defendant arraigned before us in this proceeding ; and the averments of this replication charge home on *it* the alleged delinquency.   And when this delinquency is charged directly upon the bank, the corporate body, which is the defendant in the case, and by its corporate name, we cannot, we think, by any just construction of the language of the replication, confine its application to the acts or omissions of the cashier alone.

Nor does the replication confine itself to an allegation of neglect or omission merely, by the defendant.   Its language is :—
" The said Seneca County Bank wholly neglected and *refused* to make said statement, or cause the same to be made and transmitted to the Auditor of State, as required by law."   It is true, the pleader in the draft of this replication has not followed and incorporated the language of the statute as he might have done—and as, perhaps, as a matter of professional taste, it would have been well for him to have done—and averred that " the directors of said Seneca County Bank knowingly permitted its cashier to violate one of the provisions of said act, in this, to wit," etc.; but we are not advised of any rule of pleading which imperiously required him to do so ; and as under this general demurrer it is proper for us to look to the substance of the replication, without so much regard to mere niceties of form, we have considered the final question arising out of this branch of the case, which is, whether the averment that the bank not only neglected, but " *refused* to make said statement, or cause the same to be made and transmitted," does not fairly and necessarily imply and include all that guilty knowledge which the statute prescribes as necessary to constitute a fatal delinquency ?   A majority of the court are of opinion that it does.   The averment that *the bank wholly refused* to make the statement required by law, cannot be true, unless the attention of the directors, who are the legitimate organs of the bank, and *ex officio* competent to bind the bank by their action, and to subject it by their misconduct to the penalty of forfeiture, had been called to their duty in the premises, and they thereupon *knowingly permitted* the delinquency.

And a prompt and honest compliance with the requirements of this fifty-ninth section of the act is so essential to the public security, and so important as a safeguard against those monstrous and irremediable abuses to which institutions of this kind are but too liable, that we think the bank which wholly refuses such compliance, justly incurs the legal penalty annexed to a substantial violation of the provisions of the act under which alone it derives its corporate existence. We are of opinion, therefore, that the demurrer to the first replication is not well taken.

The second replication avers, that " on the first day of February, in the year 1853, the said company ceased to use and exercise the said franchises and privilege of banking, and voluntarily abandoned the same ; and it was by the said company then and there arranged and determined, that the assets of said company should, for the purpose of liquidation, pass into the hands of one Benjamin Tomb and one Sylvanus Arnold, who, under the partnership name of Tomb and Arnold, carried on and conducted the business of brokers ; and the said Tomb and Arnold did then and there receive said assets, and the Seneca County Bank thereafter wholly ceased to carry on business as a bank, but all its affairs were committed to the said Tomb and Arnold," etc.

The facts alleged in this replication are insufficient to work a forfeiture of corporate franchises on the ground of mere non-user ; for from the terms of the first section of the act of March 12, 1841, (Swan's Statutes 788,) it would seem to be fairly inferable that non-user, in order to constitute a ground of forfeiture, must have continued for the term of five years prior to the time of filing the information.

The act of March 17, 1838, (Swan's Statutes 783,) " relating to informations in the matter of quo warranto, and regulating the mode of proceeding therein," specifies the causes which, when established by proof, shall be followed by judgment of ouster of corporate franchises ; and among these specifications is the following :

" Third, whenever it shall have done or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises." And this act is general in its terms, and seems

to embrace all corporations existing or claiming to exist under the laws of this State.

Now, the replication avers, that "on the first day of February, 1853, the said company ceased to use and exercise the said franchises and privileges of banking, *and voluntarily abandoned the same.*" The statute makes "*acts which amount to a surrender*" of corporate franchises, a cause of forfeiture. *A fortiori,* an actual, direct, and express surrender of such franchises, would be cause of forfeiture; and the replication avers that the bank voluntarily *abandoned* its franchises and privileges of banking. From which it follows that, unless the pleader is rigidly restricted to the employment of the identical words of the statute, and prohibited the use of equivalent phraseology, here is a direct averment that the bank surrendered the franchise and privilege of banking. "*Abandon*—To forsake entirely, to renounce, to leave with a view never to return, to give up, or resign without control, to yield, to relinquish, or give over entirely, surrender, abdicate," etc. Webster's Dictionary.

. The rule at common law on this subject, is stated in Angell and Ames on Corp. 812, thus: "If a corporation suffer acts to be done which destroy the end and objects for which it was instituted, it is equivalent to a surrender of its rights." The same rule is laid down by Ch. J. Spencer in *Slee* v. *Bloom,* 19 J. R. 474, and by Woodworth, J., in *The People* v. *The Bank of Hudson,* 6 Cowen 220. This last case was, like the one at bar, on an information in the nature of a *quo warranto;* and rested on a state of facts substantially analogous to that averred in this replication. There, the Bank of Hudson had become insolvent, and assigned so much of its property to trustees for the purpose of paying its debts, as to prevent its resumption of banking business. Here, the Seneca County Bank has transferred its assets to a firm of brokers, for the purpose of liquidation, abandoned its corporate franchises, and wholly ceased to carry on business as a bank. There, the court held that the corporation had done that which destroyed the end and object for which the corporation was instituted, and gave judgment against the corporation. A major-

ity of the court here are of like opinion, and must overrule the demurrer to the second replication.

By the forty-fourth section of the act first above referred to, it is provided that " the stockholders, collectively, of any independent banking company, shall at no time be liable to such company, *either as principal debtors or sureties, or both*, to an amount greater than three-fifths of the amount of capital stock actually paid in, and remaining undiminished by losses or otherwise ; *nor shall the directors be so liable*, except to such amount, and in such manner, as shall be prescribed by the by-laws of such company, adopted by its stockholders, to regulate such liabilities." And the third replication alleges that, " without any such by-laws having been first made by the stockholders, the said company proceeded to make loans to the directors thereof, and to permit them to become liable as sureties for each other, and for other persons, until, on the seventh day of August, in the year 1848, the said liability of directors as principals and sureties amounted to a large sum of money, to wit: the sum of $17,593.55." The fourth and fifth replications are substantially similar to the third ; they raise the same questions, and may be considered and disposed of together with it.

The expletive " so," employed in the last clause of that portion of the statute just quoted, is not without meaning, and it must be taken to apply to and qualify something in the clause of the statute immediately preceding. Now, there are but two portions of that preceding clause to which it can possibly apply: one is the *manner* or *character* of the liability, that is, " either as principals or sureties, or both ;" and the other is the *amount* of the liability, to wit: " three-fifths of the capital stock actually paid in." We cannot hold that it applies to the latter without involving the legislature in the absurdity of permitting the directors alone, in the absence of any action of the stockholders in the premises, to absorb at least all the liabilities which the statute permits to the entire body of the stockholders collectively, and nul‐lifying those wholesome restrictions which, it is obvious from the entire scope and tenor of the act, it was intended to impose upon the evil of excessive loans to directors — that fertile source of

abuse and disaster in the management of banking institutions. We cannot admit an application which involves such consequences; and we think, moreover, the more obvious and grammatical reference of the word is to the *character* of the liability, and not to its amount. We are of opinion, then, that this clause of the statute clearly prohibits to the directors all loans and liabilities, in any amount whatsoever, until the action of the stockholders shall have intervened to limit, legalize, and regulate them. Here, then, was a plain and direct violation of the provisions of the act under which the bank derived its corporate existence.

But, it is urged in argument that the corporators may well have been ignorant, or acting under a misapprehension of the law in this respect; and it is not, in these replications, expressly averred that the bank or its directors *knowingly* violated, etc. But surely a corporation may be presumed to know the law under which it is organized, and by virtue of which alone it has its being. In respect to natural persons, and in proceedings of a penal character, ignorance of the law excuseth no one, or all are presumed to know the law; and the "same presumptions are applicable to corporations, as to natural persons." A. & A. on Corp., sec. 284; Best on Presumptions 63.

Again, it is urged in argument that it is not for every trifling violation of the act which is the charter of its existence, that the penalty of forfeiture will be exacted from a corporate body, and that the violation here alleged concerns the stockholders, and can affect their interests only, so that the State and the public have nothing to do with the matter. We readily agree that it is not for every trifling, informal, or inadvertent violation of the act, that a forfeiture will be adjudged; but we do not regard the violation here complained of as trifling, nor do we assent to the proposition that it presents a matter which can affect the interests of stockholders alone. Banks may be, and, if managed with wisdom and integrity, often are, highly useful institutions, convenient in the transactions of business, and promotive of the public interests. But the history of banking in our country and our State, and the wrecks of fortune, reputation and morals with which the line of that history is strewn, abundantly shows that, if banks are

indiscreetly or fraudulently conducted, they may also become a Pandora's box of mischief; and among the specific sources of mischief in their management, none has been more prolific than excessive credits to directors. And bankers, when unrestricted, or regardless of legal restrictions, are always tempted to fall into the very evil here sought to be guarded against.

The adoption or non-adoption of by-laws, is a matter dependent on the action of majorities; and if we look to the interests of stockholders only, we must not overlook the interests of the minority of stockholders, who may be widows and orphans for aught we know, little capable of asserting their own rights, or of close scrutiny of their own securities, and whose interests are always liable to be sacrificed by the folly or fraud of unrestricted majorities.

But it is a mistake to suppose that none but stockholders are concerned in the matter of these replications; for, however repugnant it may be to the notions or to the practices of some bankers, banks are created primarily for the public interest. Their bills are the medium of circulation; their drafts the medium of exchange; their vaults are places of deposit; and every man who has occasion to use either—and who has not?—as well as the State, the proper guardian of the public interests, is legitimately concerned in the maintenance, in their integrity and strictness, of all the restraints which the wisdom of the legislature has devised for individual and public security.

The court is unanimously of the opinion that the demurrer to the third, fourth and fifth replications ought to be overruled.

*Demurrers overruled.*